# EXHIBIT G

CD-NEW

Goad

# THE UNITED STATES COURT OF APPEALS IN AND FOR THE FIFTH CIRCUIT

**Case No.: 05-60686**

(Case No.: W-05-CA-223-WS on Transfer from U.S. District Court, Western District of Texas, Waco Division)

RECEIVED
2005 JUL 22 A 10:03
OFFICE OF IMMIGRATION LITIGATION CIVIL DIVISION

**ABREU-GOMEZ, Fatima A.,**
**(Alien # 98 716 947)**
**Petitioner,**
**v.**
**Aaron L. Cabrera, Officer in Charge, U.S. Immigration and Customs Enforcement ("USICE"), U.S. Department of Homeland Security ("DHS"), Los Fresnos, Texas, Michael J. Garcia, Director, USICE, Tom Ridge, Secretary, DHS, Sheriff Larry Lynch, McLennan County Sheriff, Waco, Texas,**
**Respondents.**

**PETITIONER'S REPLY TO**
**RESPONDENTS' MOTION TO DISMISS FOR LACK OF JURISDICTION, OPPOSITION TO MOTION FOR A STAY OF REMOVAL, AND REQUEST TO VACATE THE SCHEDULE FOR FILING THE RECORD**

**COMES NOW FATIMA A. ABREU-GOMEZ**, hereinafter, "Ms. Abreu-Gomez," by and through the undersigned counsel, and hereby respectfully submits the following reply to the Respondent's Motion to Dismiss for Lack of Jurisdiction, Opposition to Motion for Stay of Removal, and Request to Vacate the Schedule for Filing the Record.

39-76-1620.
13

Ms. Abreu-Gomez is seeking judicial review of the Department of Homeland Security's adverse "determination" of placing her in "expedited removal proceedings" pursuant to §1225(b).

Ms. Abreu-Gomez' claims exemption from the applicability of expedited removal proceedings as a result of a recently enacted rule contained in the August 11, 2004, Federal Register which, in part, prohibits the Department of Homeland Security from applying expedited removal proceedings to Cuban citizens. 69 Fed. Reg. 48877. See Appendix A.

Title 8 U.S.C. §1252(e)(3)(A) provides:

> "Judicial review of *determinations* under section 1225(b) ... is available in an action instituted *in the United States District Court for the District of Columbia.*" (emphasis added). See *Brumme v. INS*, 275 F.3d 443, 449 (5th Cir. 2001)

The Department of Homeland Security gathers that judicial review is only allowed when the Department of Homeland Security "implement[s]" policy and then only within "60 days after the date" the directive or policy is implemented. Respondent's July 20, 2005, Mot. to Dismiss 6.

However, this narrow interpretation of the relevant statute negates Congress' will that "[j]udicial review of *determinations* under section 1225(b) ... is available."

The Respondent's claim that any action brought outside the 60 days of the implementation of the directive or policy would be "untimely" simply

frustrates congressional intent to allow habeas corpus proceedings, however, limited. Indeed, Congress contemplated the possibility of circumstances in which the alien would have to avail himself of the protection of the Great Writ.

Department of Homeland Security, Customs Border Protection employees failed to follow their own directive to exempt Cuban citizens from expedited removal proceedings.

"Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 US 199, 235 (1974); *See also Accardi v. Saughnessy*, 347 U.S. 260 (1954); *Yellin v. U.S.*, 374 U.S. 109 (1963) (decisions of an agency made in violation of its own procedures are reversible even in the absence of a due process violation since agencies must obey their own rules).

In reversing *Accardi* and *Yellin*, the Supreme Court relied on the rule of administrative law for INS's violations of their regulations rather than the due process clause. See also *U.S. v. Kiriaze*, 172 F.2d 1000 (5th Cir. 1949); *Cuesta v. U.S.*, 230 F.2d 704 (5th Cir. 1956) (INS regulations are binding and have effect of law); *and Suh v. INS*, 592 F.2d 230, 231 (5th Cir. 1979), *vacated on other grounds* 646 F.2d 909 (Fifth Circuit Court of Appeals does not look with favor upon INS's violating its own regulations).

It is unreasonable to conclude that the Department of Homeland Security, Customs and Border Protection possesses unbridled authority to improperly apply an inapplicable proceeding when a directive clearly demonstrates that same proceedings not be utilized. Judicial intervention is necessary in instances that the Department Homeland Security improperly fails to apply a rule or directive.

The Respondents concede Ms. Abreu-Gomez is a "citizen of Cuba." The August 11, 2004 rule issued by Department of Homeland Security Secretary Tom Ridge makes an express exception to not apply "expedited removal proceedings" in the case of "Cuban citizens *or* nationals." 69 Fed. Reg. 48877, 48881 (August 11, 2004). (emphasis added). Appendix A.

Because Ms. Abreu-Gomez is a Cuban citizen and because she entered into the United States through the Brownsville point-of-entry she is simply not subject to "expedited removal proceedings."

The port-of-entry at Brownsville, Texas is located within the McAllen Sector of the Customs and Border Protection. 69 Fed. Reg. 48877, 48880 (August 11, 2004). Such persons encountered within the McAllen sector

shall be placed in expedited removal proceedings except natives or citizens of Cuba. [1]

The Department of Homeland Security is failing to apply the August 11, 2004 directive in Ms. Abreu-Gomez' case.

Ms. Abreu-Gomez sets forth that the Department of Homeland Security, Customs Border Protection's determination to place her in expedited removal proceedings must be reviewed under habeas corpus proceedings, however, before the United States District Court for the District of Columbia. 8 U.S.C. §1252(e)(3)(A).

The Attorney General (now the Secretary of Homeland Security), pursuant to section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii), designated that aliens apprehended "within the C[ustoms] and B[order] P[rotection] Border Patrol sector[] of ... McAllen," Texas are subject to "expedited removal proceedings" as contained in Section 235(b)(1) of the

---

1 The McAllen Sector has recently been renamed the "Rio Grande Valley ("RGV") Sector. Ms. Abreu-Gomez' original writ of habeas corpus motion incorrectly represented that the "Brownsville" "port-of-entry" was located within the C[ustoms] and B[order] P[rotection] Border Patrol sector[] of ... Laredo, [Texas]." Pet. Writ of Hab. Corp., Page 8. On July 14, 2005, the undersigned counsel inquired with Ms. Marissa Villareal, an employee of the CBP McAllen Sector Headquarters, to ascertain what sector the Brownsville point-of entry was located in since many of the CBP officers were perplexed when asked same question. According to Ms. Villareal, the Brownsville point-of-entry is located in what is now known as the "Rio Grande Valley Sector," formerly the "McAllen Sector." The undersigned counsel apologizes for any inconvenience resulting from this error.

Immigration and Nationality Act, 8 U.S.C. §1225(b)(1). See 69 Fed. Reg. 48877, 48880 - 48881 (August 11, 2004) attached as Appendix A.

**Ms. Abreu-Gomez' Case Should Transfer the case to the United States District Court, District of Columbia, or, in the alternative, be Remanded Back to the United States District Court, Western District of Texas for Consideration of Ms. Abreu-Gomez' Writ of Habeas Corpus**

This Honorable Court of Appeals should transfer the instant proceedings to the United States District Court, District of Columbia pursuant to 8 U.S.C. §1252(e)(3)(A) and 28 U.S.C. §1631. [2]

Section 242(a)(1) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §1252(a)(1), as amended by sections 101 and 106 the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, known also as the "REAL ID" Act, *See* Public Law 109-13, 119 Stat. 231, enacted on May 11, 2005, provides in relevant part;

---

2 Title 28 U.S.C. Sec. 1631, titled "Transfer to cure want of jurisdiction" provides; Whenever a civil action is filed in a court as defined in section 610 of this title or an appeal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

> General orders of removal. - Judicial review of a final order of removal (***other than an order of removal without a hearing pursuant to section 1225(b)(1)***) is governed only by chapter 158 of title 28 of the United States Code, except as provided in subsection (b) ... (emphasis added).

Section 1225(b)(1) "expedited removal proceedings" are separate and distinct from "General orders of removal." Indeed Section 242(a)(2), INA, 8 U.S.C. §1252(a)(2), as amended by sections 101 and 106 the REAL ID Act, titled "Matters not subject to judicial review" - provides in relevant part;

> (A) Review relating to section 1225(b)(1).-Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, United States Code, or any other habeas corpus provision, and sections 1361 and 1651 of such title,1 no court shall all have jurisdiction to review--
>
> (i) *except as provided in subsection (e) of this section*, any *individual determination* or to entertain any other cause or claim arising from or relating to the implementation or operation of an order of removal pursuant to section 1225(b)(1) of this title,
>
> (ii) *except as provided in subsection (e) of this section,* a decision by the Attorney General to invoke the provisions of such section,
>
> (iii) the application of such section to individual aliens, including the determination made under section 1225(b)(1)(B) of this title, or
>
> (iv) *except as provided in subsection (e) of this section*, procedures and policies adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title.

Subparagraph (A) of 8 U.S.C. §1252(a)(2) is the only subparagraph amended by sections 101 and 106 the REAL ID Act which has any relation to "expedited removal proceedings" as contained in 8 U.S.C. §1225(a)(1).

Section 1252(e), 8 U.S.C., is left ***unchanged*** by sections 101 and 106 of the REAL ID Act, and is titled "Judicial Review of Orders Under Section 1225(b)(1)." Same §1252(e) provides in relevant part;

> (1) Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may—
>
> > (A) enter declaratory, injunctive, or other equitable relief in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title *except as specifically authorized in a subsequent paragraph of this subsection* ... (emphasis added).

Subparagraph (2) of §1252(e) goes on to provide;

> (2) Habeas corpus proceedings
> Judicial review of any determination made under section 1225(b)(1) of this title is available in habeas corpus proceedings, but shall be limited to determinations of—
> (A) whether the petitioner is an alien,
> (B) ***whether the petitioner was ordered removed under such section***, and
> (C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is an alien lawfully admitted for permanent residence, has been admitted as a refugee under section 1157 of this title, or has been granted asylum under section 1158 of this title, such status not having been terminated, and is entitled to such further inquiry as prescribed by the Attorney General pursuant to section 1225(b)(1)(C) of this title.

The scope of inquiry "shall be limited to whether [the expedited order of removal] in fact was issued and whether it relates to the petitioner." 8 U.S.C. §1252(e)(5). Expedited removal procedures should not have been

utilized against Ms. Abreu-Gomez and therefore cannot "relate[] to [Ms. Abreu-Gomez]."

There shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal. *Id.*

Congress intended to allow persons such as Ms. Abreu-Gomez the opportunity to seek *habeas corpus* relief in the United States District Court, District of Columbia. 8 U.S.C. §1252(e)(3)(A).

Ms. Abreu-Gomez is not challenging her inadmissibility in the instant proceeding. Ms. Abreu-Gomez is challenging the Department of Homeland Security's decision to not apply the directive or policy issued on August 11, 2004 the Department of Homeland Security is otherwise mandated to follow.

The Untied States District Court for the District of Columbia then "may order no remedy or relief ***other than*** to require that the petitioner be provided a hearing in accordance with section 1229a of this title." 8 U.S.C. §1252(e)(3)(B) (emphasis added).

If there is an adverse decision by the immigration court in removal proceedings under section 1229a, 8 U.S.C., the alien who originally was placed in "expedited removal proceedings" may then "obtain judicial review of any resulting final order of removal pursuant to subsection (a)(1) of [8 U.S.C. §1252]." 8 U.S.C. §1252(e)(4)(B).

The REAL ID Act in no way amended judicial relief in the form of habeas corpus to aliens ordered removed under "expedited removal proceedings" under 8 U.S.C. §1225(b)(1).

With the passage of the REAL ID Act, Congress could have eliminated habeas corpus relief to aliens ordered removed under "expedited removal proceedings", however, it chose not to do so.

In same manner, Congress could have made amended 8 U.S.C. §1252(e)(3)(B) to reflect a United States Court of Appeals as the venue for a habeas corpus petition based on an expedited order of removal under 8 U.S.C. §1225(b)(1), however, Congress allowed the United States District Court, District of Columbia to remain as the venue for habeas corpus petitions challenging Department of Homeland Security determinations to apply expedited removal procedures to a particular alien.

The controlling principle is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written by Congress. *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476, (1992).

Congress clearly stated there is "[j]udicial review ***of determinations*** under section 1225(b)" (emphasis added) and that such review is to be had in the "United States District Court, District of Colombia."

The Supreme Court has made clear "time and time again" that all canons of statutory interpretation, including legislative history and the disfavor for interpretations that render other statutory provisions superfluous, are mere rules of thumb which must always yield to the plain and unambiguous statutory text set forth by Congress. *Connecticut National Bank v. Germain*, 503 U.S. 249, 253 (1992).

The REAL ID Act in no way amends the United States District Court, District of Columbia's jurisdiction to entertain Ms. Abreu-Gomez' case.

The Service is improperly utilizing expedited removal proceedings on a Cuban citizen contrary to Secretary Ridge's directive that expedited removal proceedings not apply to "Cuban citizens *or* nationals." 69 Fed. Reg. 48877, 48881 (August 11, 2004).

Section 8, 1182(a)(9)(A)(i) provides;

> Any alien who has been ordered removed under section 1225(b)(1) of this title or at the end of proceedings under section 1229a of this title initiated upon the alien's arrival in the United States and who again seeks admission within 5 years of the date of such removal (or within 20 years in the case of a second or subsequent removal or at any time in the case of an alien convicted of an aggravated felony) is inadmissible.

It is worthy of mention that Ms. Abreu-Gomez was a Judge in Cuba. Ms. Abreu-Gomez fell into disfavor with the Castro regime when she commenced to issue "rulings that weren't in accordance with the Castro regime." See Appendix B, Page 8, Transcript Contained in Record of Determination/Credible Fear Worksheet.

Due to the obvious persecution encountered by the dissidents in some cases Ms. Abreu-Gomez "dismiss[ed] these cases on technicalities," to the disapproval of her superiors, Id.

The foregoing circumstances led Ms. Abreu-Gomez to leave Cuba. Clearly, Ms. Abreu-Gomez is a proponent for the ideals of a democratic society who would make an excellent member of our democratic society.

If the Department of Homeland Security is successful in physically removing Ms. Abreu from the United States under the expedited order of removal, she will be unable to re-enter the United States of America for a period of five (5) years after her physical removal. 8 U.S.C. §1182(a)(9)(A)(i). The foregoing circumstances should not be the end result of someone who embraces the ideals encompassed in the Constitution United States as evident by her actions that were contrary to the Castro regime.

Removal proceedings under 8 U.S.C. §1229a would allow Ms. Abreu-Gomez the adequate means in which to properly pursue an asylum claim or other applications for relief including an application to adjust her status to that of lawful permanent resident of the United States pursuant to the Cuban Adjustment Act, when eligible for same.

The August 11, 2004, directive issued by Department of Homeland Security Secretary Tom Ridge specifically exempts Ms. Abreu-Gomez from being subjected to "expedited removal."

Ms. Abreu-Gomez continues to be detained in a jail in Texas waiting her unlawful "expedited removal" from the United States on July 28, 2005.

Finally, Congress specifically allows habeas corpus proceeding in a United States District Court..

In *American-Arab Anti-Discrimination Comm. v. Ashcroft*, 272 F. Supp. 2d 650, 671 (D. Mich., 2003), a United States District Court granted the petitioner's writ of *habeas corpus* due to Department of Homeland Security's misapplication of expedited removal proceedings to the petitioners.

While due process is curtailed in Ms. Abreu-Gomez' case due to her being an alien who technically has not gained entry in to the United States, Ms. Abreu-Gomez still possess the "right to have the immigration laws

lawfully applied to" her. Id at *American-Arab Anti-Discrimination Comm. v. Ashcroft*, 671.

In same manner, the United States District Court, Western District of Texas, Waco Division, possessed authority to issue the writ of *habeas corpus*, irrespective of the amendments contained in the REAL ID Act.

A review of the relevant statute and its amendments as contained in the REAL ID Act reflects that the amendments requiring transfer of petitions for writs of *habeas corpus* to an appellate court or the necessity to file a writ of habeas corpus in an appellate court subsequent to the enactment of the REAL ID Act pertain only to petitions for writ of *habeas corpus* challenging standard *orders of removal* entered pursuant to 8 U.S.C. §1229a proceedings and ***not*** to expedited orders of removal pursuant to 8 U.S.C. §1225.

**WHEREFORE** this Honorable Court should remand the matter to the United States District Court, Western District of Texas, Waco Division, for consideration of the petitioner's writ of habeas corpus petition,

***or, in the alternative,***

pursuant to the "transfer statute," 28 U.S.C.§1631, transfer the instant proceedings to the United States District Court, District of Columbia, to allow Ms. Abreu-Gomez the opportunity to have the United States District

Court, District of Columbia, transfer Ms. Abreu-Gomez' case to an immigration court pursuant to 8 U.S.C. §1252(e)(4)(B) wherein Ms. Abreu-Gomez will be able to seek additional forms of relief available to her in §1229a removal proceedings including, but not limited to, any other form of relief this Honorable Court may deem as just and proper.

Respectfully Submitted,

Eduardo Soto, Esq.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing pleading was mailed by U.S. Postal Service, First Class-Postage Prepaid, to the following party this 21st day of July, 2005.

United States Department of Justice
Ms. Shelley R. Goad
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

Eduardo Soto, Esq.
999 Ponce de Leon Blvd. #940
Miami, Fl. 33134
Tel: 305-446-8686
Fax: 305-529-0445

# "APPENDIX A"

(OMB) for review and clearance under the Paperwork Reduction Act of 1995.

**DATES:** Fax written comments on the collection of information by September 10, 2004.

**ADDRESSES:** OMB is still experiencing significant delays in the regular mail, including first class and express mail, and messenger deliveries are not being accepted. To ensure that comments on the information collection are received, OMB recommends that written comments be faxed to the Office of Information and Regulatory Affairs, OMB, Attn: Fumie Yokota, Desk Officer for FDA, FAX: 202–395–6974.

**FOR FURTHER INFORMATION CONTACT:** Karen L. Nelson, Office of Management Programs (HFA–250), Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, 301–827–1482.

**SUPPLEMENTARY INFORMATION:** In compliance with 44 U.S.C. 3507, FDA has submitted the following proposed collection of information to OMB for review and clearance.

**Draft Guidance for Industry on Pharmacogenomic Data Submissions (OMB Control Numbers 0910–0014, 0910–0001, and 0910–0338)—Extension**

The guidance provides recommendations to sponsors submitting or holding investigational new drugs (INDs), new drug applications (NDAs), or biologic liscensing applications (BLAs) on what pharmacogenomic data should be submitted to the agency during the drug development process. Sponsors holding and applicants submitting INDs, NDAs, or BLAs are subject to FDA requirements in parts 312, 314, and 601 (21 CFR 312, 314, and 601) for submitting to the agency data relevant to drug safety and efficacy (§§ 312.22, 312.23, 312.31, 312.33, 314.50, 314.81, 601.2, and 601.12).

*Description of Respondents*: Sponsors submitting or holding INDs, NDAs, or BLAs for human drugs and biologics.

*Burden Estimate*: The guidance interprets FDA regulations for IND, NDA, or BLA submissions, clarifying when the regulations require pharmacogenomics data to be submitted and when the submission of such data is voluntary. The pharmacogenomic data submissions described in the guidance that are required to be submitted to an IND, NDA, BLA, or annual report are covered by the information collection requirements under parts 312, 314, and 601 and are approved by OMB under control numbers 0910–0014 (part 312—INDs; approved until January 1, 2006); 0910–0001 (part 314—NDAs and annual reports; approved until March 31, 2005); and 0910–0338 (approved until August 31, 2005).

The guidance distinguishes between pharmacogenomic tests that may be considered valid biomarkers appropriate for regulatory decisionmaking, and other, less well developed exploratory tests. The submission of exploratory pharmacogenomic data is not required under the regulations, although the agency encourages the voluntary submission of such data.

The guidance describes the voluntary genomic data submission (VGDS) that can be used for such a voluntary submission. The guidance does not recommend a specific format for the VGDS, except that such a voluntary submission be designated as a VGDS. The data submitted in a VGDS and the level of detail should be sufficient for FDA to be able to interpret the information and independently analyze the data, verify results, and explore possible genotype-phenotype correlations across studies. FDA does not want the VGDS to be overly burdensome and time-consuming for the sponsor.

FDA has estimated the burden of preparing a voluntary submission described in the guidance that should be designated as a VGDS. Based on FDA's familiarity with sponsors' interest in submitting pharmacogenomic data during the drug development process, FDA estimates that approximately 20 sponsors will submit approximately 80 VGDSs and that, on average, each VGDS will take approximately 10 hours to prepare and submit to FDA.

In the **Federal Register** of November 4, 2003 (68 FR 62461), FDA published a 60-day notice requesting public comment on the information collection provisions. No comments were received on the information collection estimates.

TABLE 1.—ESTIMATED ANNUAL REPORTING BURDEN[1]

| | Number of Respondents | Number of Responses per Respondent | Total Annual Responses | Hours per Response | Total Hours |
|---|---|---|---|---|---|
| Voluntary genomic data submissions | 20 | 4 | 80 | 10 | 800 |

[1] There are no capital costs or operating and maintenance costs associated with this collection.

Dated: August 5, 2004.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 04–18360 Filed 8–6–04; 12:04 pm]

BILLING CODE 4160–01–S

## DEPARTMENT OF HOMELAND SECURITY

### Bureau of Customs and Border Protection

### Designating Aliens For Expedited Removal

**AGENCY:** Bureau of Customs and Border Protection, DHS.

**ACTION:** Notice.

**SUMMARY:** This notice authorizes the Department of Homeland Security to place in expedited removal proceedings any or all members of the following class of aliens: Aliens determined to be inadmissible under sections 212(a)(6)(C) or (7) of the Immigration and Nationality Act who are present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, who are encountered by an immigration officer within 100 air miles of the U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the fourteen-day (14-day) period immediately prior to the date of encounter. DHS believes that exercising its statutory authority to place these individuals in expedited removal proceedings will enhance national security and public safety by facilitating prompt immigration determinations, enabling DHS to deal more effectively with the large volume of persons seeking illegal entry, and ensure removal from the country of those not granted relief, while at the same time protecting the rights of the individuals affected.

DATES: This notice is effective on August 11, 2004.

ADDRESSES: Please submit written comments to: Regulations Branch, Office of Regulations and Rulings, Bureau of Customs and Border Protection, 1300 Pennsylvania Avenue, NW., Washington, DC 20229. *See* SUPPLEMENTARY INFORMATION section for more details on submission of comments.

FOR FURTHER INFORMATION CONTACT: Dana E. Graydon, Acting Associate Chief, Office of Border Patrol, U.S. Customs and Border Protection,1300 Pennsylvania Ave., NW., Suite 6.5–E, Washington, DC 20229, *dana.graydon@dhs.gov*, 202–344–3153.

SUPPLEMENTARY INFORMATION: Please submit written comments, original and two copies, to the address listed above on or before after October 12, 2004. Submitted comments may be inspected at the Office of Regulations and Rulings, Bureau of Customs and Border Protection, 799 9th Street, NW., Washington, DC, during regular business hours. Arrangements to inspect submitted comments should be made in advance by calling Mr. Joseph Clark at (202) 572–8768.

Section 302 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Public Law 104–208, Div. C, 110 Stat. 3009–546, amended section 235(b) of the Immigration and Nationality Act ("Act"), 8 U.S.C. 1225(b), to authorize the Attorney General (now the Secretary of Homeland Security as designated under the Homeland Security Act of 2002) to remove, without a hearing before an immigration judge, aliens arriving in the U.S. who are inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the Act, 8 U.S.C. 1182(a)(6)(C) and 1182(a)(7). Under section 235(b)(1) of the Act, 8 U.S.C. 1225(b)(1), expedited removal proceedings may be applied to two categories of aliens. First, section 235(b)(1)(A)(i) of the Act, 8 U.S.C. 1225(b)(1)(A)(i), permits expedited removal proceedings for aliens who are "arriving in the United States." "Arriving aliens" are defined by regulation to mean "an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international waters and brought into the United States by any means whether or not to a designated port-of-entry." (8 CFR 1.1(q)). Cuban citizens who arrive at U.S. ports-of-entry by aircraft are exempted from this first category of aliens subject to expedited removal under section 235(b)(1)(F) of the Act, 8 U.S.C. 1225(b)(1)(F). Second, section 235(b)(1)(A)(iii) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii), permits the Attorney General (now the Secretary of Homeland Security), in his or her sole and unreviewable discretion, to designate certain other aliens to whom the expedited removal provisions may be applied. Section 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), authorizes the Secretary to apply (by designation) expedited removal proceedings to aliens who arrive in, attempt to enter, or have entered the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the U.S. continuously for the two-year period immediately prior to the date of determination of inadmissibility.

By statute, an alien present in the U.S. who has not been admitted shall be deemed for purposes of the Act to be an applicant for admission. 8 U.S.C. 1225(a), section 235(a)(1) of the Act. Once alienage has been established, an alien applicant for admission has the burden of establishing that he or she is clearly and beyond doubt entitled to be admitted and is not inadmissible under section 212 of this Act. Aliens who have not been admitted or paroled and who are subject to expedited removal under this designation have the burden of proof to show affirmatively that they are not inadmissible and have maintained the required continuous physical presence in the U.S. Any absence from the U.S. shall serve to break the period of continuous physical presence. 8 CFR 235.3(b)(1)(ii).

Pursuant to 8 CFR 235.3(b)(1)(ii) (62 FR 10312, 10355, March 6, 1997), the Attorney General provided that her designation authority would be exercised by the Commissioner of the former Immigration and Naturalization Service (INS). Pursuant to sections 102(a), 441, 1512(d) and 1517 of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2310, 6 U.S.C. 112, 251, 552(d), 557, and 8 CFR 2.1, the authority of the Attorney General and the Commissioner of the INS in accordance with 8 U.S.C. 235(b)(1)(A)(iii) and 8 CFR 235.3(b)(1)(ii), respectively, was transferred to the Secretary of Homeland Security, and references to the Attorney General or the Commissioner in the statute and regulations are deemed to refer to the Secretary.

DHS has a pressing need to improve the security and safety of the nation's land borders, and expanding expedited removal between ports of entry will provide DHS officers with a valuable tool to meet that objective. Presently DHS officers cannot apply expedited removal procedures to the nearly 1 million aliens who are apprehended each year in close proximity to the borders after illegal entry. It is not logistically possible for DHS to initiate formal removal proceedings against all such aliens. This is primarily a problem along the southern border, and thus the majority of such aliens are Mexican nationals, who are "voluntarily" returned to Mexico without any formal removal order. Based upon anecdotal evidence, many of those who are returned to Mexico seek to reenter the U.S. illegally, often within 24 hours of being voluntarily returned (it is not uncommon for DHS officers to apprehend the same individual many times over a span of several months). On the southern land border with Mexico, those aliens who are apprehended who are not Mexican nationals cannot be returned to Mexico. Currently, non-Mexican nationals who are inadmissible may be voluntarily returned to their country of citizenship or nationality via aircraft, or placed in formal removal proceedings under section 240 of the Act. Because DHS lacks the resources to detain all third-country nationals (aliens who are neither nationals of Mexico nor Canada) who have been apprehended after illegally crossing into the U.S. from both the northern and southern land borders, many of these aliens are released in the U.S. each year with a notice to appear for removal proceedings. Many of these aliens subsequently fail to appear for their removal proceedings, and then disappear in the U.S.

Without limiting its ability to exercise its discretion in the event of a national emergency, other unforeseen events, or a change in circumstances, DHS plans under this designation as a matter of prosecutorial discretion to apply expedited removal only to (1) third-country nationals and (2) to Mexican and Canadian nationals with histories of criminal or immigration violations, such as smugglers or aliens who have made numerous illegal entries. We recognize that certain aliens, including unaccompanied minors, members of the Class Action Settlement in *American Baptist Churches* v. *Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991) (which settled the claims of a class of Salvadorans and Guatemalans regarding handling of asylum claims), and aliens who may be eligible for cancellation of removal under section 240A of the Act,

for example, may possess equities that weigh against the use of expedited removal proceedings. Accordingly, in appropriate circumstances and as an exercise of prosecutorial discretion, officers will be able to permit certain aliens described in this notice to return voluntarily, withdraw their application for admission, or to be placed into regular removal proceedings under section 240 of the Act in lieu of expedited removal proceedings.

In the interests of focusing enforcement resources upon unlawful entries that have a close spatial and temporal nexus to the border, this notice does not implement the full nationwide expedited removal authority available to DHS pursuant to section 235 of the Act, 8 U.S.C. 1225. Nor does this notice limit DHS from implementing the full nationwide enforcement authority of the statute through publication of a subsequent **Federal Register** notice. The statute provides DHS with the authority to apply expedited removal to aliens who cannot establish that they have maintained a physical presence in the U.S. continuously for the two-year period immediately prior to the date of determination of inadmissibility. The statute also does not limit geographically the application of expedited removal. At this time, DHS has elected to assert and implement only that portion of the authority granted by the statute that bears close temporal and spatial proximity to illegal entries at or near the border. Accordingly, this notice applies only to aliens encountered within 14 days of entry without inspection and within 100 air miles of any U.S. international land border.

It is anticipated under this designation that expedited removal will be employed against those aliens who are apprehended immediately proximate to the land border and have negligible ties or equities in the U.S. Nevertheless, this designation extends to a 100-mile operational range because many aliens will arrive in vehicles that speedily depart the border area, and because other recent arrivals will find their way to near-border locales seeking transportation to other locations within the interior of the U.S. The 100-mile range already has been established by regulation as a reasonable distance from the external boundary of the U.S. for the purpose of preventing the illegal entry of aliens into the U.S. *See* section 287(a)(3) of the Act; 8 CFR 287.1(a)(2) and (c).

The use of expedited removal orders, which prohibit reentry for a period of 5 years, will deter unlawful entry, and make it possible to pursue future criminal prosecution against those aliens who continue to enter the U.S. in violation of law. It will also accelerate the processing of inadmissible aliens because it generally does not require an appearance before an immigration judge, except in certain circumstances. Deterring future entries and accelerating removals will enhance DHS's ability to oversee the border, and to focus its resources on threats to public safety and to national security. DHS also believes that the use of expedited removal will likely interfere with human trafficking and alien smuggling operations, which are growing in sophistication, and which induce aliens from all over the world to cross the country's borders. Alien smuggling organizations have been responsible for numerous violent crimes, including homicide, hostage-taking, and crimes involving sexual exploitation. DHS expects that the expansion of expedited removal under this notice will ultimately reduce the number of aliens who risk injury or death attempting to enter the U.S. through difficult mountainous and desert terrain, as well as decrease property crimes in border areas.

All aliens placed into expedited removal as a result of this designation will have the same rights to a credible fear screening by an asylum officer, and the right to review of an adverse credible fear determination by an immigration judge, that are provided to arriving aliens who are currently placed into expedited removal after being denied admission at a port of entry. Any alien who falls within this designation, who is placed in expedited removal proceedings, and who indicates an intention to apply for asylum or who asserts a fear of persecution or torture will be interviewed by an asylum officer who will determine whether the alien has a credible fear as defined in section 235(b)(1)(B)(v) of the Act, 8 U.S.C. 1225(b)(1)(B)(v). If that standard is met, the alien will be referred to an immigration judge for a removal proceeding under section 240 of the Act, sections 235(b)(1)(A)(ii) and (B) of the Act, 8 U.S.C. 1225(b)(1)(A)(ii) and (B); 8 CFR 235.3(b)(4). The Forms I–867A and I–867B currently used by officers who process aliens under the expedited removal program provide to all aliens in expedited removal proceedings information concerning the credible fear interview, in accordance with the statutory requirement at section 235(b)(1)(B)(iv) of the Act, 8 U.S.C. 1225(b)(1)(B)(iv). The forms require that the officer inquire whether the alien has any reason to fear harm if returned to his or her country. Officers authorized to administer the expedited removal program will be trained to be alert for any verbal or non-verbal indications that the alien may be afraid to return to his or her homeland.

Similarly, all aliens placed into expedited removal as a result of this designation, who claim lawful permanent resident, refugee, asylee status, or U.S. citizenship will receive the same procedures, including the right to review of any adverse expedited removal order by an immigration judge, that are provided to arriving aliens making similar status claims who are currently placed in expedited removal at ports of entry under 8 CFR 235.3(b). DHS, with limited exceptions, plans to detain aliens who are placed in expedited removal under this designation. Section 235(b)(1)(B)(iii)(IV) of the Act, 8 U.S.C. 1225(b)(1)(B)(iii)(IV), and 8 CFR 235.3(b)(2)(iii) direct that any alien who is placed in expedited removal proceedings shall be detained pending a final determination of credible fear and, if found not to have such a fear, such alien shall be detained until removed. Parole of such alien under 8 CFR 235.3(b)(2)(iii) may be permitted only when the Secretary determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective. Section 235(b)(1)(B)(ii) of the Act, 8 U.S.C. 1225(b)(1)(B)(ii), directs that if a credible fear has been established, the alien shall be detained for further consideration of the protection claim or claims. Under Department of Justice regulations, immigration judge review of custody determinations is permitted only for bond and custody determinations pursuant to section 236 of the Act, 8 U.S.C. 1226, 8 CFR 1236, and 8 CFR 1003.19(a). Aliens subject to expedited removal procedures under section 235 of the Act (including those aliens who are referred after a positive credible fear determination to an immigration judge for proceedings under section 240 of the Act) are not eligible for bond, and therefore are not eligible for a bond redetermination before an immigration judge. Parole of aliens determined to have a credible fear may be considered in accordance with section 212(d)(5) of the Act, 8 U.S.C. 1182(d)(5), and 8 CFR 212.5.

The expedited removal authority implemented in this Notice will not be employed against Cuban citizens because removals to Cuba cannot presently be assured and for other U.S. policy reasons.

The Department has determined that good cause exists under the

Administrative Procedure Act (APA), 5 U.S.C. 553(b)(3)(B) and (d)(3), to exempt this notice from the notice and comment requirements under the APA. Delaying the implementation of this notice to allow public notice and comment would be impracticable, unnecessary and contrary to the public interest.

Congress explicitly authorized the Secretary of Homeland Security to designate categories of aliens to whom expedited removal proceedings may be applied, and made clear that "[s]uch designation shall be in the sole and unreviewable discretion of the Secretary and may be modified at any time." Section 235(b)(1)(A)(iii)(1) of the Act, 8 U.S.C. 1225(b)(1)(A)(iii)(I). The large volume of illegal entries, and attempted illegal entries, and the attendant risks to national security presented by these illegal entries, necessitates that DHS expand the expedited removal program as provided in this designation. DHS is confident that the experience gained through implementation of the expedited removal program at ports of entry will enable DHS to expand the program in a manner that is both effective and humane.

There is an urgent need to enhance DHS's ability to improve the safety and security of the nation's land borders, as well as the need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations. The expansion of expedited removal will increase the deterrence of illegal entries by ensuring that apprehension quickly leads to removal. This is especially critical because of the environmental dangers faced by aliens illegally entering the U.S. across desert or mountainous areas. In the Arizona desert alone, since the initiation of the Arizona Border Control Initiative (ABC) in March of 2004, the Border Patrol has rescued hundreds of aliens in distress and has unfortunately discovered over 40 aliens who have died in the attempt to enter the U.S.

This designation is necessary to remove quickly from the U.S. aliens who are encountered shortly after illegally entering the U.S. across the land borders. The ability to detain aliens while admissibility and identity is determined and protection claims are adjudicated, as well as to quickly remove aliens without protection claims or claims to lawful status, is a necessity for national security and public safety. As a critical element of a number of DHS initiatives to enhance security along the border, the expansion of expedited removal will increase national security, diminish the number of illegal entries, and impair the ability of smuggling organizations to operate. Accordingly, for the foregoing reasons, the Department has determined that public notice and comment prior to promulgation of this notice would be impracticable, unnecessary and contrary to the public interest as those terms are used under the APA.

Although the Department believes for the foregoing reasons that pre-promulgation notice and comment procedures are not statutorily mandated in this case, DHS is interested in receiving comments from the public on all aspects of the expedited removal program, but especially on the effectiveness of the program, problems envisioned by the commenters, and suggestions on how to address those problems. DHS believes that by maintaining a dialogue with interested parties, DHS can ensure that the program is even more effective in combating and deterring illegal entry, while at the same time protecting the rights of the individuals affected.

The expansion of expedited removal under this notice will also support the Arizona Border Control Initiative (ABC), a program designed to secure and protect the Arizona border. Working with other Federal, State, local and tribal entities, DHS has placed significant personnel and technical assets on the border to decrease the deaths of illegal immigrants in the desert; and to lower the rate of violent crime related to illegal border traffic in Southern Arizona. The ABC began operations in March 2004. For the reasons stated above, the ABC's success will rely in part upon the ability of DHS officers to place inadmissible aliens apprehended shortly after illegal entry into expedited removal.

Every year, illegal aliens from many different countries continue to enter the U.S. illegally across the nation's land borders. It is critical for public safety and national security that these aliens are not released into the U.S. without adequate verification of their identities and backgrounds.

**Notice of Designation of Aliens Subject to Expedited Removal Proceedings**

Pursuant to section 235(b)(1)(A)(iii) of the Immigration and Nationality Act ("Act") and 8 CFR 235.3(b)(1)(ii), I order as follows:

(1) Except as provided in paragraph (5), the Department of Homeland Security, through its component bureaus, may place in expedited removal proceedings any or all members of the following class of aliens: Aliens who are inadmissible under sections 212(a)(6)(C) or (7) of the Act, who are physically present in the U.S. without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, who are encountered by an immigration officer within 100 air miles of any U.S. international land border, and who have not established to the satisfaction of an immigration officer that they have been physically present in the U.S. continuously for the 14-day period immediately prior to the date of encounter. Each alien subject to this notice bears the affirmative burden to show to the satisfaction of an immigration officer that the alien has been present in the U.S. continuously for the relevant 14-day period. This notice does not apply to aliens who arrive at U.S. ports-of-entry, as these aliens are already subject to expedited removal. This notice will be given effect only with respect to apprehensions made within the CBP Border Patrol sectors of (Laredo, McAllen, Del Rio, Marfa, El Paso, Tucson, Yuma, El Centro, San Diego, Blaine, Spokane, Havre, Grand Forks, Detroit, Buffalo, Swanton, and Houlton).

(2) Any alien who falls within this designation who indicates an intention to apply for asylum or who asserts a fear of persecution or torture will be interviewed by an asylum officer to determine whether the alien has a credible fear as defined in section 235(b)(1)(B)(v) of the Act, 8 U.S.C. 1225(b)(1)(B)(v). If that standard is met, the alien will be referred to an immigration judge for proceedings under section 240 of the Act, 8 U.S.C. 1229a.

(3) Any alien who is placed in expedited removal proceedings under this designation who claims lawful permanent resident, refugee, asylee status, or U.S. citizenship will be processed in accordance with the procedures provided in 8 CFR 235.3(b) and 8 CFR 1235.3(b).

(4) Any alien who is placed in expedited removal proceedings under this designation will be detained pursuant to section 235(b) of the Act, 8 U.S.C. 1225(b), with certain exceptions, until removed. However, aliens determined to have a credible fear may be considered by DHS for parole in accordance with section 212(d)(5) of the Act and 8 CFR 212.5. Aliens detained pursuant to the expedited removal provisions under section 235 of the Act (including those aliens who are referred after a positive credible fear determination to an immigration judge for proceedings under section 240 of the Act) are not eligible for bond, and therefore are not eligible for a bond

redetermination before an immigration judge.

(5) This notice applies to aliens described in paragraph (1) who are encountered within the U.S. beginning August 11, 2004.

(6) The expedited removal proceedings contemplated by this notice will not be initiated against Cuban citizens or nationals.

Dated: August 3, 2004.

**Tom Ridge,**

*Secretary of Homeland Security.*

[FR Doc. 04–18469 Filed 8–10–04; 8:45 am]

BILLING CODE 4820–02–P

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–4903–N–63]

### Notice of Proposed Information Collection: Comment Request; Contract and Subcontract Activity

**AGENCY:** Office of the Chief Information Officer, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of Management and Budget (OMB) for review, as required by the Paperwork Reduction Act. The Department is soliciting public comments on the subject proposal.

This is a request for approval of a revision to the currently approved information collection, which enables HUD to monitor and evaluate Minority Business Enterprise (MBE) activities against the total program activity and the designated MBE goals. Reports are submitted annually to Congress. This information collection combines two previously approved collections, OMB control numbers 2577–0088 and 2502–0355. OMB control number 2535–pending will now be used for this collection.

**DATES:** *Comments due:* October 12, 2004.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Wayne Eddins, Reports Management Officer, AYO, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; e-mail *Wayne_Eddins@HUD.gov*; telephone (202) 708–2374. This is not a toll-free number. Copies of available documents may be obtained from Mr. Eddins and at HUD's Web site at *http://www5.hud.gov:63001/po/i/icbts/collectionsearch.cfm.*

**FOR FURTHER INFORMATION CONTACT:** Lillian Deitzer, Information Technology Specialist, AYO, Department of Housing and Urban Development, 451 Seventh Street, SW., Washington, DC 20410; e-mail *Lillian_L_Deitzer@HUD.gov*; telephone (202) 708–2374. This is not a toll-free number.

**SUPPLEMENTARY INFORMATION:** The Department will submit the proposed information collection to OMB for review, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35, as amended).

This Notice is soliciting comments from members of the public and affecting agencies concerning the proposed collection of information to: (1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information; (3) Enhance the quality, utility, and clarity of the information to be collected; and (4) Minimize the burden of the collection of information on those who are to respond; including through the use of appropriate automated collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

This Notice also lists the following information:

*Title of Proposal:* Contract and Subcontract Activity.

*OMB Control Number, if applicable:* 2535–pending.

*Description of the need for the information and proposed use:* Information will enable HUD to monitor and evaluate Minority Business Enterprise (MBE) activities against the total program activity and the designated MBE goals. Reports are submitted annually to Congress. This information collection combines two previously approved collections, OMB control numbers 2577–0088 and 2502–0355. OMB control number 2535–pending will now be used for this collection.

*Agency form numbers, if applicable:* HUD 2516.

*Estimation of the total number of hours needed to prepare the information collection including number of respondents, frequency of response, and hours of response:* An estimation of the total numbers of hours needed to prepare the information collection is 5,000, number of respondents is 5,000, frequency of response is "annually," and the hours per response is 1 hour.

*Status of the proposed information collection:* Revision of a currently approved collection.

**Authority:** Section 3506 of the Paperwork Reduction Act of 1995, 44 U.S.C. Chapter 35, as amended.

Dated: August 4, 2004.

**Wayne Eddins,**

*Departmental Reports Management Officer, Office of the Chief Information Officer.*

[FR Doc. 04–18301 Filed 8–10–04; 8:45 am]

BILLING CODE 4210–72–P

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

[Docket No. FR–4907–N–26]

### Notice of Proposed Information Collection: Comment Request; Automated Clearing House (ACH) Program Application—Title I Insurance Charge Payments System

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Notice.

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of Management and Budget (OMB) for review, as required by the Paperwork Reduction Act. The Department is soliciting public comments on the subject proposal.

**DATES:** *Comments Due Date:* October 12, 2004.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Wayne Eddins, Reports Management Officer, Department of Housing and Urban Development, 451 7th Street, SW., L'Enfant Plaza Building, Room 8001, Washington, DC 20410 or *Wayne Eddins@hud.gov.*

**FOR FURTHER INFORMATION CONTACT:** Lester J. West, Director, Financial Operations Center, Department of Housing and Urban Development, 52 Corporate Circle, Albany, NY 12203, telephone (518) 464–4200 x4206 (this is not a toll free number) for copies of the proposed forms and other available information.

**SUPPLEMENTARY INFORMATION:** The Department is submitting the proposed information collection to OMB for review, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35, as amended).

# " APPENDIX B "

Department of Homeland Security
U.S. Citizenship and Immigration Services

# Record of Determination/Credible Fear Worksheet

| HLG | ZHN | A98 716 947 | ABREU GOMEZ |
|---|---|---|---|
| District Office Code | Asylum Office Code | Alien's File Number | Alien's Last/ Family Name |
| Lubbad | Ali | Cuban / SPANISH | |
| Asylum Officer's Last Name | Asylum Officer's First Name | Alien's Nationality | |

*All statements in italics must be read to the applicant*

**SECTION I:** INTERVIEW PREPARATION

1.1 4/25/05 Date of arrival [MM/DD/YY]

1.2 Brownsville, TX Port of arrival

1.3 4/25/05 Date of detention [MM/DD/YY]

1.4 P.I.S.P.C., BUENA VISTA RD., RT. 3, BOX 341, LOS FRESNOS, TX 78566 Place of detention

1.5 4/25/05 Date of AO orientation [MM/DD/YY]

1.6 ______ If orientation more than one week from date of detention, explain delay

1.7 4/29/05 / 5/02/05 Date of interview [MM/YY/DD]

1.8 P.I.S.P.C., BUENA VISTA RD., RT. 3, BOX 341, LOS FRESNOS, TX 78566 Interview site

1.9 ☒ Applicant received and signed Form M-444 and relevant *pro bono* list on 4/25/05 Date signed [MM/DD/YY]

1.10 Does applicant have consultant(s)? ☐ Yes ☒ No

1.11 If yes, consultant(s) name, address, telephone number and relationship to applicant ______

1.12 Persons present at the interview (check which apply)

1.13 ☐ Consultant(s)

1.14 ☐ Other(s), list: ______

1.15 ☒ No one other than applicant and asylum officer

1.16 Language used by applicant in interview: Spanish

1.17 LSA 200268 Interpreter Service, Interpreter ID Number. ☒ Yes ☐ No Interpreter Has Forms. 10:59 Time Started. 11:11 Time Ended

1.18 200268 Interpreter Service, Interpreter ID Number. ☒ Yes ☐ No Interpreter Has Forms. 11:40 Time Started. 12:02 Time Ended

1.19 200268 Interpreter Service, Interpreter ID Number. ☒ Yes ☐ No Interpreter Has Forms. 10:15 Am Time Started. 11:51 Time Ended

1.20 ☐ Interpreter was not changed during the interview

1.21 ☐ Interpreter was changed during the interview for the following reason(s):

1.22 ☐ Applicant requested a female interpreter replace a male interpreter, or *vice versa*

1.23 ☐ Applicant found interpreter was not competent

1.24 ☐ Applicant found interpreter was not neutral

1.25 ☐ Officer found interpreter was not competent

1.26 ☐ Officer found interpreter was not neutral

1.27 ☐ Bad telephone connection

1.28 ☒ Asylum officer read the following paragraph to the applicant at the beginning of the interview:

*The purpose of this interview is to determine whether you may be eligible for asylum or protection from removal to a country where you fear persecution or torture. I am going to ask you questions about why you fear returning to your country or any other country you may be removed to. It is very important that you tell the truth during the interview and that you respond to all of my questions. This may be your only opportunity to give such information. Please feel comfortable telling me why you fear harm. U.S. law has strict rules to prevent the disclosure of what you tell me today about the reasons why you fear harm. The information you tell me about the reasons for your fear will not be disclosed to your government, except in exceptional circumstances. The statements you make today may be used in deciding your claim and in any future immigration proceedings. It is important that we understand each other. If at any time I make a statement you do not understand, please stop me and tell me you do not understand so that I can explain it to you. If at any time you tell me something I do not understand, I will ask you to explain.*

**SECTION II:** **BIOGRAPHIC INFORMATION**

2.1 ABREU GOMEZ
Last Name/ Family Name [ALL CAPS]

2.2 FATIMA ~~ALIET~~
First Name

2.3 Aliet
Middle Name

2.4 [redacted]
Date of birth [MM/DD/YY]

2.5 Gender ☐ Male ☒ Female

2.6 none
Other names and dates of birth used

2.7 Cuba
Country of birth

2.8 Cuba y Spain
Country (countries) of citizenship (list all)

2.9 ~~Cuba~~ SPAIN, Barcelona
Address prior to coming to the U.S. (List Address, City/Town, Province, State, Department and Country).

2.10 Hispanic
Applicant's race or ethnicity

2.11 Catholic/Christian/Other (NONE)
Applicant's religion

2.12 Spanish
All languages spoken by applicant

2.13 Marital status: ☐ Single ☐ Married ☐ Legally separated ☒ Divorced ☐ Widowed

2.14 Did spouse arrive with applicant? ☐ Yes ☐ No

2.15 Is spouse included in applicant's claim? ☐ Yes ☐ No

2.16 If currently married (including common law marriage) list spouse's name, citizenship, and present location (if with applicant, provide A-Number):

______________________________

______________________________

2.17 Children: ☐ Yes ☒ No

2.18 List any children (*Use the continuation section to list any additional children*):

| Date of birth (MM/DD/YY) | Name | Citizenship | Present location (if w/PA, list A-Numbers) | Did child arrive with PA? | Is child included in PA's claim? |
|---|---|---|---|---|---|
| | | | | ☐ Yes ☐ No | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No | ☐ Yes ☐ No |
| | | | | ☐ Yes ☐ No | ☐ Yes ☐ No |

2.19 Does applicant claim to have a medical condition (physical or mental), or has the officer observed any indication(s) that a medical condition exists? If YES, answer questions 2.20 and 2.21 and explain below. ☐ Yes ☒ No

2.20 Has applicant notified the facility of medical condition? ☐ Yes ☐ No

2.21 Does applicant claim that the medical condition relates to torture? ☐ Yes ☐ No

2.22 Does the applicant have a relative, sponsor or other community ties, including spouse or child already listed above? ☒ Yes ☐ No

2.23 If YES, provide information on relative or sponsor (use continuation section, if necessary):

Name: Marilena Varela Leal

Relationship: Cousin

Address: 8860 SW 43rd St. Miami FL 33165

Telephone Number: 305 552 9196

☐ Citizen ☒ Legal Permanent Resident ☐ Other

**SECTION III:**

**CREDIBLE FEAR INTERVIEW**

**The following notes are not a verbatim transcript of this interview. These notes are recorded to assist the individual officer in making a credible fear determination and the supervisory asylum officer in reviewing the determination. There may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening.**

The asylum officer must elicit sufficient information related to both credible fear of persecution and credible fear of torture to determine whether the applicant meets the threshold screening. Even if the asylum officer determines in the course of the interview that the applicant has a credible fear of persecution, the asylum officer must still elicit any additional information relevant to a fear of torture. Asylum officers are to ask the following questions and may use the continuation sheet if additional space is required. If the applicant replies YES to any question, the asylum officer must ask follow-up questions to elicit sufficient details about the claim in order to make a credible fear determination.

3.1 a. *Have you or any member of your family ever been mistreated or threatened by anyone in any country to which you may be returned?*

☒ Yes ☐ No Cuba – No / Spain – Yes

(See Attached Q&A)

Spain – Felt discriminated in Spain – see extra notes

b. *Do you have any reason to fear harm from anyone in any country to which you may be returned?*

☒ Yes ☐ No Cuba? Jail Why? because I left Cuba – they call it being a traitor

Spain? discriminated against because I am a foreigner

c. If YES to questions *a* and/or *b*, was it or is it because of any of the following reasons? (Check each of the following boxes that apply).

☐ Race ☐ Religion ☒ Nationality ☐ Membership in a particular social group ☒ Political Opinion

CUBA = Political Opinion.

SPAIN = Cuban Nationality.

98 716 947

☒ At the conclusion of the interview, the asylum officer must read the following to applicant:

3.2

If the Department of Homeland Security determines you have a credible fear of persecution or torture, your case will be referred to an immigration court, where you will be allowed to seek asylum or withholding of removal based on fear of persecution or withholding of removal under the Convention Against Torture. The Field Office Director in charge of this detention facility will also consider whether you may be released from detention while you are preparing for your hearing. *If the asylum officer determines that you do not have a credible fear of persecution or torture, you may ask an Immigration Judge to review the decision. If you are found not to have a credible fear of persecution or torture and you do not request review, you may be removed from the United States as soon as travel arrangements can be made. Do you have any questions?*

---

3.3 ☒ At the conclusion of the interview, the asylum officer must read a summary of the claim, consisting of the responses to Questions 3.1 a-c and information recorded in the Additional Information/Continuation section, to applicant.

****Typed Question and Answer (Q&A) interview notes and a summary and analysis of the claim must be attached to this form for all negative credible fear decisions. These Q&A notes must reflect that the applicant was asked to explain any inconsistencies or lack of detail on material issues and that the applicant was given every opportunity to establish a credible fear.

## SECTION IV: CREDIBLE FEAR FINDINGS

### A. Credible Fear Determination:

Credibility

4.1 ☒ There is a significant possibility that the assertions underlying the applicant's claim could be found credible in a full asylum or withholding of removal hearing.

4.2 ☐ Applicant found not credible because (check boxes 4.3-4.5, which apply):

- 4.3 ☐ Testimony was internally inconsistent on material issues.
- 4.4 ☐ Testimony lacked sufficient detail on material issues.
- 4.5 ☐ Testimony was not consistent with country conditions on material issues.

Nexus

4.6 ☐ Race 4.7 ☐ Religion 4.8 ☒ Nationality 4.9 ☐ Membership in a Particular Social Group (Define the social group): ______

4.10 ☒ Political Opinion 4.11 ☐ Coercive Family Planning [CFP] 4.12 ☐ No Nexus

Credible Fear Finding

4.13 ☐ Credible fear of persecution established.

OR

4.14 ☐ Credible fear of torture established.

OR

4.15 ☒ Credible fear of persecution NOT established and there is not a significant possibility that the applicant could establish eligibility for withholding of removal or deferral of removal under the Convention against Torture.

---

### B. Possible Bars:

4.16 ☒ Applicant could be subject to a bar(s) to asylum or withholding of removal (check the box(es) that applies and explain on the continuation sheet):

- 4.17 ☐ Particularly Serious Crime 4.18 ☐ Security Risk 4.19 ☐ Aggravated Felon
- 4.20 ☐ Persecutor 4.21 ☐ Terrorist 4.22 ☒ Firmly Resettled
- 4.23 ☐ Serious Non-Political Crime Outside the United States

4.24 ☐ Applicant does not appear to be subject to a bar(s) to asylum or withholding of removal.

Name: FÁTIMA ALIET ABREU GOMEZ
A#: 98 716 947

# Extra Notes:

Where is Granma located? East

What is the Cuban National Anthem? OK

A# 98 716 947
Fatima A. Abreu Gomez
Cuba/Spain

05/02/2005
Start:10:15AM
End: 11:51AM

Q: What is your complete name?
A: Fatima Aliet Abreu Gomez.

Q: What is you birth date?
A: [redacted]

Q: Are you being treated well in custody?
A: Yes.

Q: Do you have any medical problems/concerns?
A: No.

Q: Are you represented by an attorney today?
A: No.

Q: Are you married?
A: No.

Q: Do you have any children?
A: No

Q: Do you have any religious affiliation?
A: No.

Q: What race/ethnicity do you consider yourself?
A: White.

Q: What languages do you speak?
A: Spanish only.

Q: Are you willing to perform this interview today without legal representation?
A: Yes.

Q: What do you think will happen to you if you are returned to Cuba?
A: I will go to prison and not be allowed to work or have anything there: I will be detained, followed, and harassed by them?

Q: Who is them?
A: Cuban government.

A# 98 716 947
Fatima A. Abreu Gomez
Cuba/Spain

05/02/2005
Start:10:15AM
End: 11:51AM

Q: Why would the Cuban government want to do these things to you?
A: Because I am not in agreement with Castro and that's why I left Cuba and anyone who leaves Cuba is viewed as a traitor and that is why government would do these things to me, and because I came to the US and asked for asylum so I would definitely be viewed as a traitor?

Q: When did you leave Cuba?
A: December 1998.

Q: Did you ever have problems in Cuba before you left in December 1998?
A: Yes, I was a judge in the municipality of Playa and I gave out rulings that weren't in accordance with the Castro regime.

Q: Can you explain this a little more?
A: I at times, had cases that involved people accused of treason, and I would dismiss these cases on technicalities.

Q: Did anything happen to you as a result of your rulings?
A: Yes, the president of the court Mr. Ousmane heavily questioned me, and he told me that my decision was contrary to all other courts. At this point I was marked and this means that I had all of my judicial decisions reviewed by supervisors and I was harassed constantly.

Q: What made you decided to leave Cuba?
A: I was marked as a counterrevolutionary and pressured constantly.

Q: How did you realize this?
A: I was told directly by superiors that I was a counterrevolutionary and constantly pressured.

Q: Did they ever tell you consequences of being a counterrevolutionary?
A: No, they just constantly gave me psychological pressure and prevented all employment opportunities.

Q: How did they prevent employment opportunities?
A: They would give me bad references and identify me as a counterrevolutionary; I couldn't even work as a lawyer anymore?

Q: How did you get to Spain?
A: I got a tourist visa and went in December 1998.

Q: When did you become Spanish citizen?
A: 5 or six months ago.

Q: What do you think will happen to you if you are returned to Spain?

A# 98 716 947
Fatima A. Abreu Gomez
Cuba/Spain

05/02/2005
Start:10:15AM
End: 11:51AM

A: I don't know exact consequences?

Q: Are you afraid to return to Spain?
A: Yes.

Q: Why are you afraid to return to Spain?
A: I was there six years and felt poorly there.

Q: Why did you feel poorly in Spain?
A: Because the people in Spain treated me poorly.

Q: What people?
A: Spanish people.

Q: Anyone in particular treat you badly?
A: No, in general.

Q: What kind of treatment are you referring to exactly?
A: I felt fear.

Q: Why did you feel fear?
A: Because of acts, for instance: I would call to rent an apartment and would be told it is already rented, then I would have a Spanish friend call back and he would be told that he could come over and take a look, right after I called! Also, I was told when trying to rent places that they didn't want foreigners.

Q: Did these people say anything else to you?
A: No.

Q: Any estimate of how often this happened?
A: Maybe ten times, in the end I couldn't rent anything in my name, I would take a room-sublet a room with several others.

Q: Did you experience any other problems in Spain?
A: Yes, plenty of things, I had a motorcycle a small one and when I parked it in the neighborhood I got a note that said "you South American piece of shit, if you park your motorcycle on the sidewalk again we'll burn it".

---

Q: Where in Spain did you live?
A: Barcelona.

Q: Did you ever go to the Spanish authorities with your problems?
A: No.

Q: Why not?

A# 98 716 947
Fatima A. Abreu Gomez
Cuba/Spain

05/02/2005
Start:10:15AM
End: 11:51AM

A: Because I couldn't prove anything? I called an organization called SOS racism; they said if I didn't know whom the person was they couldn't do anything, which I understand, I know it's difficult to believe that this happens to people in a democratic country?

Q: Any other problems in Spain?
A: I was told by a private insurance company (Alliance) that as a foreigner I would have to pay my insurance premium in full. Most Spanish pay monthly but I was told I would have to pay in full.

Q: Did this problem occur before or after you became a Spanish Citizen?
A: Before or after it would be the same?

Q: Did it occur before or after?
A: After I became a Spanish citizen, to them I am just a foreigner; it has to do with my accent.

Q: Do you think all foreigners are treated this way or just Cubans?
A: I think all Latinos are treated this way and Arabs too?

Q: Did you have any other problems because of your accent?
A: Yes, I don't want to go back there, these were daily occurrences, I was told on one occasion when I was applying for a job that the job was only for Spaniards or members of the European Community.

Q: Did you ever seek help of government of Spain in regard to this matter?
A: No, I don't know, I don't think about it, I guess because I didn't come from a democratic country?

Q: Why did you decide to become a Spanish citizen?
A: I guess just to be able to get a passport to leave the country And come to the US.

Q: Did you ever attempt to get any help from Spanish anti-discriminatory groups or other immigrant resettlement groups in Spain?
A: No, just that time I told them about the note I got on my motorcycle, there's not a lot they can do either?

---

Q: Do you ever have any problems with Spanish government?
A: No.

Q: Ever have any problems with the Spanish police?
A: No.

Q: How did you support yourself in Spain?
A: Worked in Restaurants, furniture stores, grocery markets?

A# 98 716 947
Fatima A. Abreu Gomez
Cuba/Spain

05/02/2005
Start:10:15AM
End: 11:51AM

Q: Why didn't you continue in legal field?
A: I didn't even try because I didn't want to renew license every eight months and because I wasn't intending to stay there.

Q: What made you decide to come to the USA?
A: My family is here in Miami, FL.

Q: When did family come to US?
A. Approximately 10 years ago?

Q: Why did you stay living in Spain for six years?
A: Because I didn't have an opportunity?

Q: When did you become a Spanish Legal Permanent Resident?
A: Maybe about one year ago?

Q: So it took one year to become a citizen?
A: Yes.

Q: How did you become a Citizen of Spain?
A: First, I worked as a maid in home and got residency for one year, then I renewed residency for three years, then I fulfilled a legal residency requirement and was offered citizenship in Spain.

Q: Did you ever apply for asylum in Spain?
A: No, they don't give asylum there to Cubans?

Q: When did you leave Spain?
A: April 2005, I went to Mexico then I came to USA?

Q: So am I correct in stating that you are afraid of returning to Spain because you fear being discriminated against by the Spanish population generally on account of your Cuban origin/nationality?
A: Yes, exactly.

Q: Do you think the people in Spain treated you poorly for any other reason(s)?
A: No, just because I am from Cuba and a foreigner.

Q: anything else concerning this fear of return to Spain that I missed?
A: I don't feel Spanish; it was just a bridge to come to USA, like many Cubans do?

Q: Do you fear being physically harmed in Spain?
A. No, I don't think so?

A# 98 716 947
Fatima A. Abreu Gomez
Cuba/Spain

05/02/2005
Start:10:15AM
End: 11:51AM

Q: Do you think anyone in Spain would want to physically hurt, mistreat, or torture you if you had to go back there?
A: No, I just don't feel like I belong there in Spain?

Q: Any other reason/reasons you are afraid to return to Spain?
A: No.

Q: Am I correct in stating that you fear being imprisoned in Cuba because of your decision to oppose Cuban government policies in regard to your adjudications a judge, as well as your decision to leave Cuba for an extended period of time and request Asylum in the USA?
A. Yes.

Q: Any other reasons you are afraid to return to Cuba?
A: No.

Q: Ever been affiliated with, supported, or assisted a group that has been accused of using violence to realize its goals?
A: No

Q: Ever arrested?
A: Never.

Q: Ever harmed another person?
A: No, never.

Q: Is there anything else today that you would like to tell me that you feel is important we talk about?
A: No.

Q: Are you a citizen or LPR of a country other than Spain?
A: No.